Pacific Rim Law Group
Mia Yu  SB#290740
301 E Foothill Blvd., Suite 202
Arcadia CA 91006
Tel 312-622-7670
Fax: 626-226-5913
Email: Lawyerym@hotmail.com


Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES

| | |
|---|---|
| SUSAN LESTER, JEANNY T. CHAN, JUAN GUEVARA, ELMA COLEMAN, EVIE LENGKONG, PAUL LO, JOCELYN TUPAS, ROGER TUPAS, DR. YASUSHI TAMURA, REIKO TAMURA, MINERVA ESPIRITU, TONY ING, LINA WONG, PURITA ROMAS SILVA, JOSIE ALEJO, RUTH BARENG, MICHAEL BARENG, EARL LESTER, FUJIKO SUZUKI WEN ZHONG, EMIGDIO J. PEREZ, NOEL PATRICIO MOSQUEDA, MACARTHUR MEDINA, ELDA MEDINA, ZITA CHUA, MARTIN MEDINA, JOELLE MEDINA, JESSE MALAGUIT, ROSITA MALAGUIT, ROSITA MALAGUIT, KWON LEE,  SAMUEL K. K. CHUNG, LOLITA CUNANAN, NANETTE ORDONA, PONCE JOHN ORDONA individually, and on behalf of other members of the public similarly situated, | Case No.: <br><br> JURY TRIAL DEMANDED <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> (1) Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code sections 17200 *et seq.*); <br><br> (2) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. section 1962(c)); |
| Plaintiffs, <br> vs. <br><br> BANK OF AMERICA, N.A.; J.P MORGAN CHASE & COMPANY; J.P. MORGAN | (3) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. section |

-1-

CHASE BANK, N,A ; CHASE HOME
FINANCE L.L.C; WELLS FARGO BANK
N.A.; CITIMORTGAGE, INC.;
WHOLESALE AMERICA; U.S. BANK,
N.A.; UNION BANK OF SWITZERLAND;
INDYMAC BANK; CMG FINANCIAL;
FIRSTKEY MORTGAGE, LLC; EMC
MORTGAGE LLC; BARCLAYS;
FEDERAL HOME LOAN MORTGAGE
CORPORATION; OCWEN LOAN
SERVICING LLC; NATIONSTAR
MORTGAGE LLC; VERIPRISE
PROCESSING SOLUTION LLC;
QUALITY LOAN SERVICE CORP;
SPS/SELECT PORTFOLIO SERVICING
INC.; PROVIDENT FUNDING
ASSOCIATES LP; RECOVERY
SERVICES LLC; CASHCALL INC.;
OPTION ONE MORTGAGE CORP.;
SOUNDVIEW HOME LOAN TRUST;
AND DOES 1 – 100.
                    Defendants

1962(d));

(4) Unjust Enrichment

For their complaint against Bank of America, N.A.; J.P Morgan Chase & Company;  J.P. Morgan Chase Bank, N,A ,; Chase Home Finance L.L.C ; Wells Fargo, Bank N.A.; CitiMortgage; Wholesale America; U.S. Bank, N.A.; Union Bank of Switzerland (UBS); IndyMac Bank (now known as One West Bank); CMG Financial; First Key Financial, LLC; EMC Mortgage LLC; Barclays; Federal Home Loan Mortgage Corporation; Ocwen Loan Servicing LLC; Nationstar Mortgage LLC; Quality Loan Service Corp; Veriprise Processing Solution LLC; SPS/Select Portfolio Servicing Inc.; Recovery Services LLC; Provident Funding Associates LP; Cashcall Inc.; Option One Mortgage Corp.; Soundview Home Loan Trust; and

DOES 1 TO 100 (collectively "Defendants" ), Plaintiffs Susan Lester, Jeanny T. Chan, Juan Guevara, Elma Coleman, Evie Lengkong, Paul Lo, Jocelyn Tupas, Roger Tupas, Dr. Yasushi Tamura, Reiko Tamura, Minerva Espiritu, Tony Ing, Lina Wong, Purita Romas Silva, Josie Alejo, Ruth Bareng, Michael Bareng, Earl Lester, Fujiko Suzuki Wen Zhong, Emigdio J. Perez, Noel Patricio Mosqueda, Macarthur Medina, Elda Medina, Zita Chua, Martin Medina, Joelle Medina, Jesse Malaguit, Rosita Malaguit, Rosita Malaguit, Kwon Lee, Samuel K. K. Chung, Lolita Cunanan, Nanette Ordona and Ponce John Ordona, (collectively "Plaintiffs") individually and on behalf of all other members of the public similarly situated, based on information and belief, allege as follows:

## NATURE OF TIIE ACTION

1. This case concerns misleading and fraudulent practices committed by Defendants in the course of Defendants' home mortgage loan servicing businesses. Together, Defendants service a vast number of loans in the United States. Defendants used an automated mortgage loan management system, along with subsidiaries and inter-company departments and divisions, in order to engage in a scheme to fraudulently conceal their unlawful assessment of improperly marked-up or unnecessary fees for default-related services. This scheme cheated the borrowers who least could afford it.

2. Plaintiffs bring this action on behalf of themselves and all other homeowners who have been and continue to be devastated financially and emotionally by the defendant's abusive, fraudulent, deceptive and unfair scheme to obtain possession and title to homes by

systematically fabricating evidence in the form of fraudulent affidavits and other documents used in foreclosure proceedings against homeowners.

3.  When home mortgage borrowers get behind on their payments and go into "default", lenders conduct various default-related services.  These services are purportedly designed to protect the lender's interest in the property.

4.  Lenders are prohibited from assessing borrowers' accounts for default-related service fees that are unreasonable and unnecessary. Nor are lenders permitted to mark-up the fees for such services to earn a profit. Nevertheless, as discussed in detail below, using false pretenses to conceal the truth from borrowers, that is precisely what Defendants have done.

5.  Defendants generate hearty profits with inflated fees. Defendants earned additional, undisclosed profits by designing schemes to disguise hidden mark-ups and unnecessary fees. Defendants then employ those schemes through their various associations of subsidiaries and affiliated companies.

6.  To accomplish a hidden mark-up, Defendants mark-up the fees charged by vendors, often by100% or more, and then assess borrowers' accounts for the hidden profits without disclosing the mark-up.

7.  In connection with their schemes, Defendants routinely practice fee assessments for defaulted-related services, even when such fees are unnecessary and inappropriate. Through this strategy, Defendants quietly profit from defaulted-related service fees, at the expense of

struggling consumers. Indeed, in the third quarter of 2016 alone, Bank of America made a profit of $4.5billion representing 32% jump in profit.[1]

8.   In today's market, loans and the rights to service them are bought and sold at will, multiple times over. This is caused by relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities. This buying and selling clashes with the reasonable belief by many borrowers that the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.

9.   This situation also incentivizes fees because banks like Defendants who service loans do not profit directly from interest payments made by borrowers. Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service, instead of ensuring that borrowers stay current on their loans.

10.   When a loan fails, the borrowers are captives to the companies that service their loans. This situation is an opportunity to Banks, lenders, and their servicing companies like Defendants. So, when borrowers go into default, Defendants unilaterally decide to perform default-related services.  However, the borrower can be subjected to sudden new monthly payment increases from 50% to 100%.   In addition, borrowers have no choice but to accept Defendants' decisions and related providers.

11.   Defendants each took advantage of these circumstances, creating fees that violate the borrowers' mortgage agreements. The violations occurred after Defendants each formed

---

[1] See Bank of America Quarterly Financial Reports http://www.forbes.com/sites/antoinegara/2016/10/17/bank-of-america-profits-rise-

enterprises with their respective subsidiaries and affiliates, and then developed a uniform practice of unlawfully marking up default-related service charges that were commonly assessed against borrowers' accounts.

12. The Defendants' unlawful mark-ups allowed Defendants to earn undisclosed profits by performing these services. Defendants' marked-up fees violate borrowers' mortgage agreements because the fees exceed the actual cost of the services. The mortgage agreements require fees to be, "reasonable" or "appropriate" to protect the note holder's interest in the property. These fees that exceed the actual cost of the service are not, "reasonable" or "appropriate."

13. The banking and servicing entities were using their superior knowledge to neither take nor make risks, instead they were creating the illusion of risk when the outcome was virtually certain. These activities as practice by defendants is a common enterprise based completely on steering all "loans" into failure and foreclosure.

14. Defendants know the impropriety of marking-up the fees assessed on borrowers' accounts for default-related services. Therefore, Defendants identify these fees on mortgage statements only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances," fraudulently concealing these fees and omitting any information about Defendants' additional profits.

15. Defendants engage in buying and selling mortgage backed securities at inflated prices, on Bloomberg L.P. ("Bloomberg Markets"). As an example, the original value of a mortgage might have been $400,000. The Defendants will take that mortgage and artificially inflate the value to over one billion dollars, then bundle that mortgage with one-hundred other notes that have also been artificially inflated. The final product will be "worth" over one-hundred billion dollars, but the sum of the original notes will be worth just a fraction of that amount. Defendants formed an enterprise amongst themselves to coordinate these activities.

16. The strategic object of the common enterprise plan was to make everyone remote from liability while at the same time being part of multiple transactions --- some real and some fictitious. Remote from liability means that the entity will not be held accountable for its own actions or the actions of other entities that were all part of the scheme. The simple goal was to take other people's money and re-characterize it as the banks' and servicing entities' money.

17. Plaintiffs bring this action alleging violation of their constitutional rights under color of law, unfair and deceptive trade practices, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and unjust enrichment seeking injunctive relief and damages on behalf of themselves and the thousands of borrowers that are victimized by the Defendants' uniform financial schemes.

## JURISDICTION AND VENUE

18. Jurisdiction is proper in this Court, under 28 U.S.C. section 1332(d)(2) because the class members and the defendants are citizens of different states, the matter in controversy,

exclusive of interest and costs, exceeds the sum or value of $5,000,000, and no exceptions to jurisdiction under Section 1332(d) apply. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are a citizens.

19.   This Court also has jurisdiction over this matter under 28 U.S.C. sections 1331, 1961, 1962 and 1964. This Court has personal jurisdiction over Defendants under 18 U.S.C, section 1965.

20.   In addition, under 28 U.S.C. section 1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims derive from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

21.   Venue lies within this judicial district under 28 U.S.C. section 1391(a) and (c) because the acts, transactions and occurrences giving rise to this cause of action occurred here, certain of the Plaintiffs reside here, and the Defendants transact business here.

## PARTIES

22.   Plaintiff Susan Lester is an individual and citizen of California.

23.   Plaintiff Jeanny T. Chan is an individual and citizen of California.

24.   Plaintiff Juan Guevara is an individual and citizen of California.

25.   Plaintiff Elma Coleman is an individual and citizen of California.

26.   Plaintiff Evie Lengkong is an individual and citizen of California.

27.   Plaintiff Paul Lo is an individual and citizen of California.

28.   Plaintiff Jocelyn Tupas is an individual and citizen of California.

29.   Plaintiff Roger Tupas is an individual and citizen of California.

30.   Plaintiff Dr. Yasushi Tamura is an individual and citizen of California.

31.   Plaintiff Reiko Tamura is an individual and citizen of California.

32.   Plaintiff Minerva Espiritu is an individual and citizen of California.

33.   Plaintiff Tony Ing is an individual and citizen of California.

34.   Plaintiff Lina Wong is an individual and citizen of California.

35. Plaintiff Purita Romas Silva is an individual and citizen of California.

36. Plaintiff Jose Alejo is an individual and citizen of California.

37. Plaintiff Ruth Bareng is an individual and citizen of California.

38. Plaintiff Michael Bareng is an individual and citizen of California.

39. Plaintiff Earl Lester is an individual and citizen of California.

40. Plaintiff Fujiko Suzuki is an individual and citizen of California.

41. Plaintiff Wen Zhong is an individual and citizen of California.

42. Plaintiff Emigdio J. Perez is an individual and citizen of California.

43. Plaintiff Eliza E. Perez is an individual and citizen of California.

44. Plaintiff Noel Patricio Mosqueda is an individual and citizen of California.

45. Plaintiff MacArthur Medina is an individual and citizen of California.

46. Plaintiff Elda Medina is an individual and citizen of California.

47. Plaintiff Zita Chua is an individual and citizen of California.

48. Plaintiff Martin Medina is an individual and citizen of California.

49. Plaintiff Joelle Medina is an individual and citizen of California.

50. Plaintiff Jesse Malaguit is an individual and citizen of California.

51. Plaintiff Rosita Malaguit is an individual and citizen of California.

52. Plaintiff Kwon Lee is an individual and citizen of California.

53. Plaintiff Samuel K. K. Chung is an individual and citizen of California.

54. Plaintiff Lolita Cunanan is an individual and citizen of California.

55. Plaintiff Nanette Ordona is an individual and citizen of California.

56. Plaintiff Ponce John Ordona is an individual and citizen of California.

57. Defendant Bank of America, N.A. is a national Bank organized and existing as a national association under the National Bank Act with its headquarters in Charlotte, North Carolina.

58. Defendant J.P Morgan Chase & Company is a publicly traded corporation organized under the laws of Delaware with its principal place of business in New York, New York.

59. Defendant J.P. Morgan Chase Bank, N,A. is a subsidiary of J. P. Morgan

Chase & Co., and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C, 38 *el* seq,, with its principal place of business in Columbus, Ohio.

60.  Defendant Chase Home Finance L.L.C. is a subsidiary of J,P, Morgan Chase & Co. and J,P, Morgan Chase Bank, N.A,, and is a Delaware limited liability company, with its principal place of business in Iselin, New Jersey.

61.  Defendant Wells Fargo Bank, N,A, is a subsidiary of Wells Fargo &Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S,C, 38 with its principal place of business in San Francisco, California.

62.   Defendant Quality Loan Service Corporation, (hereinafter referred to as "QUALITY"), is a California corporation, with its principal place of business in San Diego, California

63.   Defendant Barclays is a British multinational banking and financial services company headquartered in London.

64.   Defendant Federal Home Loan Mortgage Corporation (FHLMC), known as Freddie Mac, is a public government-sponsored enterprise (GSE), headquartered in California.

65.    Other Defendants include the following banks, lenders and servicers CitiMortgage, Wholesale America, U.S. Bank, N.A., Union Bank of Switzerland (UBS), IndyMac Bank (now known as One West Bank), CMG Financial, First Key, EMC Mortgage LLC, Ocwen Loan Servicing LLC, Nationstar Mortgage LLC, Veriprise Processing Solution LLC, SPS/Select Portfolio Servicing Inc., Recovery Services LLC, Provident Funding Associates LP, Cashcall Inc., Option One Mortgage Corp., Soundview Home Loan Trust.

66.  Whenever reference is made in this complaint to any act, deed, or conduct material times herein it of defendant banks with their servicing companies or lenders with their servicing companies like defendants or other agents that are committed in connection with the enterprise scheme to steer every borrower into foreclosure.  The allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the

management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

67. Accordingly, Plaintiffs are informed and believe, and based thereon, allege that at all material times herein each Chase defendant, JP Morgan Chase & & Co., JP Morgan Chase Bank, N.A. and Chase Home Finance, LLC (collectively. "Chase ") was the agent, servant or employee of the other Chase defendants, and acted within the purpose, scope and course of said agency, service or employment, and with the express or implied knowledge, permission and consent of the other Chase defendants, and ratified and approved the acts of the other Chase defendants.

68. Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein each Wells Fargo defendant, Wells Fargo Company and Wells Fargo Bank N.A. (collectively "Wells Fargo") was the agent, servant, or employee of, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other. Accordingly, each bank or lender defendant ratified and approved the acts of the other Wells Fargo defendant.

## FACTUAL BACKGROUND

69. America's lending industry is in tumult. Much of the current upheaval derives from the fact that the lending community has deviated from traditional lending practices that married lender and borrower together. Potential borrowers go to a bank, the bank loans money and borrowers promise to repay the bank, with interest, over a specific period of time. Traditionally, the originating bank kept the loan on its balance sheet, and serviced the loan until it was paid. The bank and borrower maintained a relationship over the life of the loan, communicating and interacting. The originating bank had a financial interest in ensuring that the borrower could repay

70. However, today the typical process is not the traditional process. Mortgage backed securities, or MBS, are typical of today's market. Through a process called securitization, mortgages are packaged, bundled, and sold to investors on Wall Street. Securitization

provides banks like Defendants with the benefits of immediately being able to recover the amounts loaned and essentially eliminating the bank's risk from potential default. But these benefits come at the cost of disassociating the lending community from its borrowers. Essentially removing the relationship created by traditional lending, which gave lenders an interest in borrower's loan repayment. The divide between lenders and borrowers created numerous unexpected consequences.

71.    Securitization has created a group of companies in the lending industry, like Defendants, whose primary source of money is not from the interest on the loans that they originate. Instead of owning a loan, banks service or administer mortgages for the hedge funds and investment houses who own the loans. These banks are paid fees for their loan administration services, rather than earning income from interest on the loans. Because of this, lenders lack the financial interest in loan repayment that they once had.

72.    The prospectus is a summary of how the securitization will work but it is not subject to SEC regulations because in 1998 an amendment to the securities laws exempted "pass-through" entities from securities regulations if they were backed by mortgage bonds.

73.    Chase Home Finance L.L.C Chase Home Finance L.L.C Attached to the prospectus is a mortgage loan schedule ("MLS")  However, the body of the prospectus (which few people read or understand) discloses that the MLS is not real and is offered by way of example.

74.    Under pooling and service agreements ("PSA") with investors loan servicers like Defendants gain the right to assess additional fees from borrowers. It is also called a Pooling and Servicing Agreement to give the illusion that a pool of loans is owned by the Trust and administered by the Trustee, the Master Servicer and other entities who are described as performing different roles for various fees.  These fees are assessed to borrowers for default-related services in connection with the loan servicer's administration of borrowers' loans. These fees include Broker's Price Opinion fees, and appraisal fees.

75.    Despite the entitlement to collect these fees, the Defendants' choice to collect these fees demonstrates how America's lending industry has gone beyond reason.

76. As one Member of the Board of Governors of the Federal Reserve System has explained, "[while an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[2]

77. When banks are unhappy with the flat fees that they earn from servicing loans, and loan servicers do not make money from the interest paid on the loans they service, banks are incentivized to find other ways to profit. This " incentivization" coupled with the right to charge outrageous fees has made exploitation possible.

78. For the supposed purpose of collecting default-related service fees, Defendants each formed, with their subsidiaries, and affiliated companies an unlawful enterprise and tried to increase mortgage servicing revenues by fraudulently concealing marked-up fees assessed on borrowers' accounts.

79. Mortgage backed securities give Defendants the ability to sell mortgage debt at a greatly inflated price, and therefore make large profits. Defendant Buyer will agree to buy a MBS worth one-hundred billion dollars from Defendant Seller. Both Defendants agree that Defendant Seller will bundle together one hundred mortgages that each have a value of $300,000. The sale will be made on the Bloomberg Market. After the purchase, Defendant Buyer sells the MBS to another entity for two-hundred billion dollars. Defendant Seller makes a profit of ninety-seven billion dollars. Defendant Buyer makes a profit of one-hundred billion dollars.

80. Defendants' enterprise with other Defendants to create huge profits by buying and selling

---

[2] See Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at

CLASS ACTION COMPLAINT

mortgage backed securities, where the values of the individual mortgages within the bundle are greatly inflated. This practice is pervasive.

### Defendants Automated Loan Servicing Practices

81.  When Defendants' services are lumped together, they service a vast number of loans. Administering so many loans is a complex task. And in order to maximize profits, Defendants assign that task to computer software programs. Bank and lenders like Wells Fargo and Chase automate their loan servicing businesses through a computer software program provided by Fidelity National Information Services, Inc. The program, called Mortgage Servicing Package ("Fidelity MSP"), handles home loan management and is one of the most widely used in the United States.

82. After a loan is created, management guidelines for that loan are input into Fidelity MSP. Thereafter, the loans serviced by Defendants are managed automatically by Fidelity MSP according to those guidelines. As an example, a guideline will instruct the computer program on the appropriate time to impose late fees when a loan is past due.

83. Defendants also use "wrap around" software packages that work with the Fidelity MSP system, to assess other charges and fees. The computer software programs are designed by the executives of the Defendants, to manage borrowers' accounts and assess fees.

84. Management of loans during a pending bankruptcy is supposedly handled by Defendants' Fidelity MSP software through the program's Bankruptcy Work Station ("BWS").

85. Further, to manage loans in default, Chase also uses a software program called "FORTRACS," which automates the documentation of a loan, decision making, and default management processing. With fully integrated modules and synchronization of activities, it supports the lender's credit and collateral risk management through loss mitigation, foreclosure processing, bankruptcy monitoring, claims processing and REO management."[3]

www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan, 23, 2012).
[3] See http://www.isgn.com/Products/Fortracs.htm (last visited Feb. 8, 2012).

86. Plaintiffs are informed and believe, and based thereon, allege that as part of the Chase and
other bankers or lenders efforts to hide their actions, Chase and Wells Fargo also program
their computer systems to automatically remove some of the fees and charges typically
assessed against borrowers' accounts, when submitting those account statements to a court,
because those fees and charges have been prohibited by a particular jurisdiction or judge
within a jurisdiction. As a result there are conflicting account statements that are found to
relate to a particular subject property.

### Marked-Up and Unnecessary Fees for Default-Related Services

87. Defendants employ a strategy to generate fraudulently concealed default-related fee income
during the course of their loan servicing operations. Through this scheme, Defendants
charge borrowers for more than the actual cost of the performed default services,
Borrowers are not only assessed for unnecessary services, but then Defendants unlawfully
add additional, undisclosed profits on to the charges before they are assessed on borrowers'
accounts.

88. Defendants' operation works thusly. Defendants contract with their subsidiaries and
affiliated companies to obtain default-related services, but they do not provide the services.
The subsidiaries and affiliates obtain the services from third-party vendors. Defendants are
then charged by third-party vendors, and Defendants charge borrowers a fee that is
significantly marked-up from the third-party vendors' actual fees for the services. The mark-
ups are undisclosed to borrowers.

89. A mortgage contract between lender and borrower is made of two documents: the
promissory note ("Note") and the mortgage or deed of trust ("Security Instrument"). The
Mortgage contracts serviced by Defendants conform to the standard Fannie Mae/Freddie
Mac form contract, meaning that the contracts used by each Defendant are substantially
similar to each other. These contracts contain standard language regarding what occurs if a
borrower defaults. The Security Instrument authorizes the loan servicer, in the event of
default, to:

> "pay for whatever is reasonable or appropriate to protect the note
> holder's interest in the property and rights under the security instrument,
> including protecting and/or assessing the value of the property, and securing and/or
> repairing the property."

90.  The Security Instrument also provides that money paid by the servicer will be added to the debt of the borrower secured by the Security Instrument and will bear interest at the Note rate from the date of payment. The Note provides that the note holder:

> "will have the right to be paid back by [the borrower] for all of its
> costs and expenses in enforcing this Note to the extent not
> prohibited by applicable law. Those expenses include, for
> example, reasonable attorneys' fees."

Thus, the mortgage contract allows the servicer to pay for default-related services when necessary or appropriate, and gives the servicer the right to be paid back by the borrower. But it does not authorize the servicer to mark-up the actual cost of those services to make a profit.

91.  Broker's Price Opinions ("BPOs") are a category of default-related service fees that are utilized significantly by Defendants. BPOs are charged to borrowers with a substantial and undisclosed mark-up, which fraudulently generates revenue for Defendants.

92.  When Defendants charge marked-up fees for BPOs, they violate the agreements with borrowers. Violations occur because charges in excess of the actual cost of the services provided are not reasonable, and not appropriate to protect the note holder's interest in the property and the rights under the security instrument.

93.  The fact that Defendants do not tell borrowers that the fees assessed on their accounts are marked-up from the amount that the vendor actually charged, exhibits the wrongful nature of those marked-up fees.

94.  Although Defendants assess fees for BPOs on borrowers' accounts in amounts ranging from $95 to $135, as of December 2010, under Fannie Mae guidelines, the maximum

reimbursable rate for an exterior BPO is $80[4], and in practice, the actual cost is much less. According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30[5].'See National Association n 1' BPO Professionals (NAB POP),  Broker Price Opinion — BPO Brief, available at http;//www.nabpop,org/Advocacy-BPOBncf'-2,php (last visited Feb, 2, 2012).

## Practices Specific to Bank of America, N.A.

95.   Plaintiffs are informed and believe, and on that basis allege that Defendant Bank of America N.A. ("Bank of America"), used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

96.    Plaintiffs are informed and believe, and on that basis allege that Defendant Bank of America fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. Bank of America accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with Bank of America subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, Bank of America employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

97.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, Bank of America created an inter-company division to handle default related services. When Bank of America needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

98.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by Bank

---

[4] See Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012)

[5] See National Association of BPO Professionals (NABPOP), Broker Price Opinion – BPO Brief, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012)

of America for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

99.   Plaintiffs are informed and believe, and on that basis allege that Defendant Bank of America does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by Bank of America. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to Bank of America.

100.         Plaintiffs are informed and believe, and on that basis allege that Defendant Bank of America colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. Bank of America bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

**Practices Specific to the Chase Enterprise**

101.   J.P. Morgan Chase & Co., and its subsidiaries, defendant J.P. Morgan Chase Bank N.A. formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses. Chase services approximately 9 million mortgage loans, which is about 12% of the loans in the United States.[6]

102.   Like Wells Fargo, according to defendant J.P. Morgan Chase & Co.'s 2010 Annual Report, "when it becomes likely that a borrower is either unable or unwilling to pay, the Firm obtains a broker's price opinion of the home based on an exterior-only valuation."[7]

103.   Plaintiffs are informed and believe, and on that basis, allege that using its computerized automated mortgage loan management system and an enterprise of Chase subsidiaries and

---

[6] See J.P. Morgan Chase & Co. 2010 Annual Report at p.39, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport.pdf (last visited Jan. 24, 2012).
[7] See J.P. Morgan Chase & Co. 2010 Annual Report, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport.pdf (last visited Jan. 24, 2012).

CLASS ACTION COMPLAINT

inter-company departments and divisions, Chase unlawfully charges marked-up fees for default-related services. Furthermore, to fraudulently conceal its actions and mislead borrowers about the true nature of its actions, Chase employs a corporate practice that omits the true nature of the fees that are being assessed on borrower's accounts.

104.    Plaintiffs are informed and believe, and on that basis, allege that Chase conceals these marked-up fees for default-related services on borrowers' accounts, by identifying the charges only as "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" on borrowers' statements. Under these categories, Chase assesses fees for BPOs on borrowers' accounts, charging from $95 to $135, when in fact, on information and belief, the actual cost of each BPO is approximately $50 or less. Plaintiffs are informed and believe, and on that basis, allege that a significant number of these BPOs are ordered by Chase's Bankruptcy Processing team and Collection Department in San Diego, California.

105.    Plaintiffs are informed and believe, and on that basis, allege that under the "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" categories on borrowers' statements, Chase also assesses unnecessary and unreasonable fees for property inspections. In order to generate profits from these fees, Chase's automated loan servicing system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances. Although such inspections purportedly are conducted to guard against property loss, Chase's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are inappropriate, unnecessary, or unreasonable.

106.    Plaintiffs are informed and believe, and on that basis, allege that guidelines input into Chase's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days. After a borrower's account is past due by a set number of days, as input into the software, Chase's computer automatically generates a work order for a property inspection automatically, *and without human intervention.*

Moreover, so long as a borrower's account is past due by the requisite number of days input into the loan management software, Chase's system automatically continues to order inspections, regardless of whether it is reasonable or appropriate under the circumstances.

107.   Plaintiffs are informed and believe, and on that basis, allege that even if the property inspections were properly performed and actually reviewed by someone at the bank, Chase's continuous assessment of fees for these inspections on borrower's accounts is still improper and unreasonable because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Chase's system to automatically continue to order monthly inspections. Nothing in the reports justifies continued monitoring.

108.   In order to further lull borrowers into a sense of trust, conceal Chase's unlawful fees, and dissuade borrowers from challenging Chase's unlawful fee assessments, Chase falsely represents on statements provided to borrowers that "Other Fees" and "Advances," which are charges for BPOs and property inspections, include "amounts allowed by [borrowers'] Note and Security Instrument."

109.   As a result of Chase's unlawful enterprise, hundreds of thousands of unsuspecting borrowers are cheated out of hundreds of millions of dollars.

## Practices Specific to Wells Fargo Enterprise

110.   Defendant Wells Fargo Bank, N.A. administers approximately 10.3 million home mortgage loans, which is about one out of every seven mortgages in the United States. Wells Fargo & Company, and its subsidiary, defendant Wells Fargo Bank, N.A. formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

111.   Wells Fargo fraudulently concealed and assessed unlawfully marked-up BPO fees on borrowers' accounts, cheating hundreds of thousands of borrowers out of hundreds of millions of dollars. Wells Fargo accomplished this utilizing its computerized automated mortgage loan management system, in conjunction with Wells Fargo subsidiaries and inter-

company departments and divisions. In order to conceal the true nature of these fees, Wells Fargo employed a corporate practice of identifying the charges on borrowers' statements only as "Other Charges," or "Other Fees."

112.    In order to facilitate the scheme, Wells Fargo created an inter-company division called Premiere Asset Services ("PAS"). When Wells Fargo needs a BPO, PAS acts as its agent and sub-contracts the BPO services to third-party actors.

113.    The amount paid by Wells Fargo for the BPOs is approximately one-half to one-third as much as the amounts assessed on borrowers' accounts based on the invoices generated by PAS. Wells Fargo assesses fees for BPOs on borrowers' accounts, charging from $95 to $125, when in fact, the actual cost of each BPO is approximately $50 or less.

114.    Wells Fargo never pays PAS for the BPOs, but rather when the BPOs are completed by real estate brokers, Wells Fargo issues checks directly to the real estate brokers. Despite this reality, driven to increase profits with illegally marked-up charges, Wells Fargo assesses borrowers' accounts with fees for these "pass through" expenses, even though the assessed amounts include a profit of two to three times more than the actual expenses incurred by Wells Fargo.

115.    In furtherance of its scheme to conceal its illegal charges, PAS was created as part of Wells Fargo's enterprise to act as a phony third party vendor, making it appear to borrowers, and the courts as though the amounts assessed on borrowers' accounts are actual third party costs. Wells Fargo never discloses that it is generating profits from the BPO charges that are illegally and improperly assessed on borrowers' accounts.

116.    Similarly, Plaintiffs are informed and believe, and on that basis, allege that when Wells Fargo assesses borrowers' accounts for property inspections, Wells Fargo includes an unlawful and undisclosed mark-up. The actual cost of property inspections performed by Wells Fargo's vendors, such as First American Field Services, is $15. Nevertheless, when Wells Fargo assesses borrowers' accounts for the fees, it adds an undisclosed profit for itself, and assesses borrowers' accounts $20 for the inspection. Wells Fargo conceals its

unlawful profits by merely identifying the fee as "Other Charges," or "Inspection," without informing borrowers that the fee is marked-up. If borrowers inquire about the nature of these fees, Wells Fargo further conceals and misleads borrowers, attempting to dissuade them from challenging the charge, by telling them that such fees are "[i]n accordance with the terms of your mortgage."

117.   As a result of Wells Fargo's unlawful enterprise, hundreds of thousands of unsuspecting borrowers like Plaintiffs are cheated out of hundreds of millions of dollars.

### Practices Specific to CitiMortgage

118.   Plaintiffs are informed and believe, and on that basis allege that Defendant CitiMortgage used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

119.   Plaintiffs are informed and believe, and on that basis allege that Defendant CitiMortgage fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. CitiMortgage accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with CitiMortgage subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, CitiMortgage employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

120.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, CitiMortgage created an inter-company division to handle default related services. When CitiMortgage needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

121.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by CitiMortgage for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

122.   Plaintiffs are informed and believe, and on that basis allege that Defendant CitiMortgage

does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by CitiMortgage. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to CitiMortgage.

123.   Plaintiffs are informed and believe, and on that basis allege that Defendant CitiMortgage colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. CitiMortgage bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

**Practices Specific to U.S. Bank N.A.**

124.   Plaintiffs are informed and believe, and on that basis allege that Defendant U.S. Bank used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

125.   Plaintiffs are informed and believe, and on that basis allege that Defendant U.S. Bank fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. U.S. Bank accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with U.S. Bank subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, U.S. Bank employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

126.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, U.S. Bank created an inter-company division to handle default related services. When U.S. Bank needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

127.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by U.S. Bank for default related services is an amount which is lower than the amounts assessed on

borrowers' accounts.

128.    Plaintiffs are informed and believe, and on that basis allege that Defendant U.S. Bank does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by U.S. Bank. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to U.S. Bank.

129.    Plaintiffs are informed and believe, and on that basis allege that Defendant U.S. Bank colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. U.S. Bank bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

### Practices Specific to Union Bank of Switzerland

130.    Plaintiffs are informed and believe, and on that basis allege that Defendant Union Bank of Switzerland ("UBS") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

131.    Plaintiffs are informed and believe, and on that basis allege that Defendant UBS fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. UBS accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with UBS subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, UBS employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

132.    Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, UBS created an inter-company division to handle default related services. When UBS needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

133.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by UBS for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

134.   Plaintiffs are informed and believe, and on that basis allege that Defendant UBS does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by UBS. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to UBS.

135.   Plaintiffs are informed and believe, and on that basis allege that Defendant UBS colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. UBS bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

**Practices Specific to IndyMac Bank (now known as One West Bank)**

136.   Plaintiffs are informed and believe, and on that basis allege that Defendant IndyMac Bank ("One West") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

137.   Plaintiffs are informed and believe, and on that basis allege that Defendant One West fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. One West accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with One West subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, One West employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

138.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, One West created an inter-company division to handle default related services.

-25-

CLASS ACTION COMPLAINT

When One West needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

139.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by One West for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

140.   Plaintiffs are informed and believe, and on that basis allege that Defendant One West does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by One West. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to One West.

141.   Plaintiffs are informed and believe, and on that basis allege that Defendant One West colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. One West bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

**Practices Specific to CMG Financial**

142.   Plaintiffs are informed and believe, and on that basis allege that Defendant CMG Financial ("CMG") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

143.   Plaintiffs are informed and believe, and on that basis allege that Defendant CMG fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. CMG accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with CMG subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, CMG employed a corporate practice of identifying the charges on

CLASS ACTION COMPLAINT

borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

144.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, CMG created an inter-company division to handle default related services. When CMG needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

145.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by CMG for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

146.   Plaintiffs are informed and believe, and on that basis allege that Defendant CMG does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by CMG. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to CMG.

147.   Plaintiffs are informed and believe, and on that basis allege that Defendant CMG colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. CMG bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

### Practices Specific to FirstKey Mortgage LLC

148.   Plaintiffs are informed and believe, and on that basis allege that Defendant FirstKey Mortgage LLC ("First Key") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

149.   Plaintiffs are informed and believe, and on that basis allege that Defendant First Key fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. First Key accomplished this by utilizing its

-27-

computerized automated mortgage loan management system, in conjunction with First Key subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, First Key employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

150.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, First Key created an inter-company division to handle default related services. When First Key needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

151.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by First Key for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

152.   Plaintiffs are informed and believe, and on that basis allege that Defendant First Key does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by First Key. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to First Key.

153.   Plaintiffs are informed and believe, and on that basis allege that Defendant First Key colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. First Key bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

## Practices Specific to EMC Mortgage LLC

154.   Plaintiffs are informed and believe, and on that basis allege that Defendant EMC Mortgage LLC ("EMC") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

155.   Plaintiffs are informed and believe, and on that basis allege that Defendant EMC

fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. EMC accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with EMC subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, EMC employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

156.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, EMC created an inter-company division to handle default related services. When EMC needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

157.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by EMC for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

158.   Plaintiffs are informed and believe, and on that basis allege that Defendant EMC does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by EMC. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to EMC.

159.   Plaintiffs are informed and believe, and on that basis allege that Defendant EMC colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. EMC bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

**Practices Specific to Ocwen Loan Servicing, LLC**

160.   Plaintiffs are informed and believe, and on that basis allege that Defendant Ocwen Loan Servicing, LLC ("Ocwen") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies,

and created a scheme to defraud borrowers and obtain money from them by false pretenses.

161.   Plaintiffs are informed and believe, and on that basis allege that Defendant Ocwen fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money. Ocwen accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with Ocwen subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, Ocwen employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

162.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, Ocwen created an inter-company division to handle default related services. When Ocwen needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

163.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by Ocwen for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

164.   Plaintiffs are informed and believe, and on that basis allege that Defendant Ocwen does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by Ocwen. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to Ocwen.

165.   Plaintiffs are informed and believe, and on that basis allege that Defendant Ocwen colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. Ocwen bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

CLASS ACTION COMPLAINT

### Practices Specific to NATIONSTAR MORTGAGE LLC

166.   Plaintiffs are informed and believe, and on that basis allege that Defendant NATIONSTAR MORTGAGE LLC ("Nationstar") used its automated mortgage loan management software and an enterprise of subsidiaries, inter-company departments, divisions and affiliated companies, and created a scheme to defraud borrowers and obtain money from them by false pretenses.

167.   Plaintiffs are informed and believe, and on that basis allege that Defendant Nationstar fraudulently concealed and assessed unlawfully marked-up fees for default related services, cheating borrowers out of their money.

168.    Nationstar accomplished this by utilizing its computerized automated mortgage loan management system, in conjunction with Nationstar subsidiaries and inter-company departments and divisions. In order to conceal the true nature of these fees, Nationstar employed a corporate practice of identifying the charges on borrowers' statements as "Other Charges," or "Other Fees," or a similar term.

169.   Plaintiffs are informed and believe, and on that basis allege that in order to facilitate the scheme, Nationstar created an inter-company division to handle default related services. When Nationstar needs a default related services, this inter-company division acts as its agent and sub-contracts the default related services to third-party actors.

170.   Plaintiffs are informed and believe, and on that basis allege that the amount paid by Nationstar for default related services is an amount which is lower than the amounts assessed on borrowers' accounts.

171.   Plaintiffs are informed and believe, and on that basis allege that Defendant Nationstar does not pay its inter-company division for the default related services. Instead, the third-party actors are paid by Nationstar. And the "pass through" expenses are assessed to borrowers even though the assessed amount for the default related services are larger than the actual expense to Nationstar.

172.   Plaintiffs are informed and believe, and on that basis allege that Defendant Nationstar

colluded with other Defendants in this case and used an enterprise of the other Defendants in this case to falsely inflate the value of mortgage backed securities. Nationstar bundled mortgages together and assigned an arbitrary, false and highly inflated value to each of the individual mortgages.

### Injuries Borrowers Suffer as a Result of Defendants' Practices

173.   In addition to the direct monetary damages caused to borrowers, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

174.   The assessment of these marked-up fees can make it impossible for borrowers to become current on their loan, Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

175.   When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current. Even if borrowers pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that borrowers stay in default. After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment. This makes that payment late, creating a cascade of more fees and more arrears that keeps borrowers in delinquency. By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

176.   As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score. Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been

late with a payment or missed any payments. By keeping borrowers in default with these practices, Defendants affect whether borrowers can get a loan in the future — and what borrowers' interest rate will be on such loans.

177.    Additionally, as a result of Defendants' practices, which force borrowers to move deeper into default, borrowers are driven into foreclosure.

## THE BANK CREATED CAUSED OR INFLICTED IRREPARABLE HARM TO THE PLAINTIFF

178.    The Bank created, caused, or inflicted irreparable harm against Plaintiff when it increased Plaintiff's home loan interest rate without informing Plaintiff. Irreparable harm exists when Plaintiffs injury cannot be remedied by monetary means. In this case, Plaintiff suffered a crippled credit score, damage to personal relationships, humiliation in the form of a "letter of hardship," and Plaintiffs children's lives have been altered forever. These injuries cannot be remedied by monetary means, because the harm goes deeper than just lost money.

179.    The harm begins when Defendant increases the interest rate of Plaintiff's home loan without informing Plaintiff. Defendant's action here puts Plaintiff in a position where Plaintiff will not be able to afford to pay. If Plaintiff had had notice, then at least Plaintiff could have planned for the increase and taken measures to ensure their ability to pay. But when the increase is sprung on Plaintiff, it is nearly guaranteed to cause Plaintiffs default in the near future.

180.    After the increase in interest rate Plaintiff will seek to refinance the home loan but Defendant refuses to refinance the loan, unless Plaintiff goes into default. The requirement of default puts Plaintiff in a terrible position. Either Plaintiff must default on the loan, a circumstance that will forever affect their credit history, or Defendant will allow Plaintiff to write a letter where Plaintiff will commit and confess to their hardship. The letter is called a "letter of hardship," and writing it causes Plaintiff great anguish because it is an admission of personal fault.

181.   When Plaintiff goes into default it is very likely that their financial lives will never recover. Default on a home loan devastates a person's credit score. And in today's America, personal credit is necessary for financial survival. Wrecked personal credit is a crippling financial dilemma because it will make it very difficult for Plaintiff to purchase anything on credit. But credit and financing are an integral part of modern American life and hindered access to credit will hamper any person's success and happiness. The damage that destroyed personal credit inflicts on a person's life is not quantifiable.

182.   All the above-mentioned stresses that the Defendant's actions have caused, will also lead to strained personal relationships and adverse effects on the children of Plaintiff. Bad credit, default and humiliation at the hands of Defendant will cause severe stress on any familial relationships that Plaintiff has, especially marriage. The problems of a rocky marriage will be intensified by the stress that the Defendant's actions have caused. And such stress will even affect a perfect marriage in an adverse way. When it comes to the children of Plaintiff, they are subjected to seeing their parents stressed, fighting and humiliated. The stress that they in turn feel may cause them to turn to drugs, or violence, or other destructive habits in order to escape. If Plaintiff loses her house, then the children are made homeless and would be even more likely to turn to bad habits to escape.

183.   All of these consequences and injuries flowed from the Defendant's choice to raise interest rates without informing the borrowers. The injuries affect Plaintiff's life and financial life in deep ways. These injuries go beyond what money can fix. And because of that, these injuries are irreparable.

## THE BANK CREATED, CAUSED, OR INFLICTED IRREPARABLE HARM TO THE PLAINTIFF

184.   The Bank created, caused, or inflicted irreparable harm against Plaintiff when it increased Plaintiff's home loan interest rate without informing Plaintiff. Irreparable harm exists when Plaintiffs injury cannot be remedied by monetary means. In this case, Plaintiff suffered a crippled credit score, damage to personal relationships, humiliation in the form of a "letter

of hardship," and Plaintiffs children's lives have been altered forever. These injuries cannot be remedied by monetary means, because the harm goes deeper than just lost money.

185.        The harm begins when Defendant increases the interest rate of Plaintiff's home loan without informing Plaintiff. Defendant's action here puts Plaintiff in a position where Plaintiff will not be able to afford to pay. If Plaintiff had had notice, then at least Plaintiff could have planned for the increase and taken measures to ensure their ability to pay. But when the increase is sprung on Plaintiff, it is nearly guaranteed to cause Plaintiffs default in the near future. The sudden monthly mortgage increase can be 100% more

186.   After the increase in interest rate Plaintiff will seek to refinance the home loan but Defendant refuses to refinance the loan, unless Plaintiff goes into default. The requirement of default puts Plaintiff in a terrible position. Either Plaintiff must default on the loan, a circumstance that will forever affect their credit history, or Defendant will allow Plaintiff to write a letter where Plaintiff will commit and confess to their hardship. The letter is called a "letter of hardship," and writing it causes Plaintiff great anguish because it is an admission of personal fault.

187.   When Plaintiff goes into default it is very likely that their financial lives will never recover. Default on a home loan devastates a person's credit score. And in today's America, personal credit is necessary for financial survival. Wrecked personal credit is a crippling financial dilemma because it will make it very difficult for Plaintiff to purchase anything on credit. But credit and financing are an integral part of modern American life and hindered access to credit will hamper any person's success and happiness. The damage that destroyed personal credit inflicts on a person's life is not quantifiable.

188.   All the above-mentioned stresses that the Defendant's actions have caused, will also lead to strained personal relationships and adverse effects on the children of Plaintiff. Bad credit, default and humiliation at the hands of Defendant will cause severe stress on any familial relationships that Plaintiff has, especially marriage. The problems of a rocky marriage will

be intensified by the stress that the Defendant's actions have caused. And such stress will even affect a perfect marriage in an adverse way. When it comes to the children of Plaintiff, they are subjected to seeing their parents stressed, fighting and humiliated. The stress that they in turn feel may cause them to turn to drugs, or violence, or other destructive habits in order to escape. If Plaintiff loses her house, then the children are made homeless and would be even more likely to turn to bad habits to escape.

189.   All of these consequences and injuries flowed from the Defendant's choice to raise interest rates without informing the borrowers. The injuries affect Plaintiff's life and financial life in deep ways. These injuries go beyond what money can fix. And because of that, these injuries are irreparable.

**PLAINTIFFS CLAIMS AGAINST BANK OF AMERICA**

190.   Plaintiffs Susan Lester and Earl Lester had a mortgage with  Bank of America which has been serviced by Ocwen and Nationstar.

191.   Plaintiffs Juan Guevara and Elma Colemen had a mortgage with  Bank of America which has been serviced by Ocwen.

192.   Plaintiff Lina Wong had a mortgage with Bank of America.

193.   Plaintiff Josie Alejo had a mortgage with Bank of America which has been service by Nationstar.

194.   Plaintiffs Michael Bareng and Ruth Bareng had a mortgage with Bank of America which has been serviced by CMG.

195.   Plaintiff Fujiko Suzuki  had a Bank of America mortgage and a Chase mortgage.

196.   Plaintiff Noel Patricio Mosqueda had a mortgage with Bank of America which was serviced by Nationstar and a mortgage with Wells Fargo.

197.   Plaintiff Lolita Cunanan had a mortgage with Bank of America  that was serviced by Ocwen.

198.   Plaintiffs Jesse Malaguit and Rosita Malaguit had a mortgage with Bank of America which was serviced by Ocwen .

199.   Plaintiffs Nanette Ordona and Ponce John Ordona had a mortgage with  Bank of America.


**PLAINTIFFS CLAIMS AGAINST J.P. Morgan Ch**ase, N.A.

200.   Plaintiff Evie Lengkong had  a mortgage witb  Chase, that was serviced by  EMC and SPS/ Select Portfolio Servicing , Inc

201.   Plaintiff Paul Lo had a mortgage with Chase.

202.   Plaintiff Tony Ing had a mortgage with Chase.

203.   Plaintiff Minerva Espiritu had a mortgage with Chase.

**PLAINTIFFS CLAIMS AGAINST WELLS FARGO**

204.   Plaintiff Wen Zhong had a mortgage with Wells Fargo.

205.   Plaintiff Emigdio J. Perez had a mortgage with Wells Fargo.

206.   Plaintiffs. Martin Medina and Joelle Medina had a mortgage with Wells Fargo that was serviced by / Ocwen.

**PLAINTIFFS CLAIMS AGAINST INDYMAC**

207.   Plaintiffs Jocelyn Tupas and  Roger Tupas had a mortgage with  Indy Mac and a mortgage with One West Bank.

**PLAINTIFFS CLAIMS AGAINST CitiMortgage**,

208.   Plaintiff Zita Chua had a mortgage with Citimortgage

209.   Plaintiff Jeanny Chan had mortgages with Citimortgage & Wells Fargo.

**PLAINTIFFS CLAIMS AGAINST CASHCALL**

210.   Plaintiff Purita Ramos Silva had mortgage loans with Cashcall, Inc / Barclays / Freddie Mac

211.   Plaintiffs Macarthur Medina and  Elda Medina had a mortgage with Cashcall, Inc.

**PLAINTIFF CLAIMS AGAINST PROVIDENT**

212.    Plaintiff Samuel K.K. Chung has a claim against Provident Funding Associates L.P

**PLAINTIFFS CLAIMS AGAINST BARCLAYS**

213.    Plaintiff Purita Ramos Silva had mortgage with Barclays, Cashcall, Inc / Freddie Mac.

214.    Plaintiff Kwon Lee had a mortgage with Barclays - Argent Mortgage Company, LLC / Freddie Mac

### PLAINTIFFS CLAIMS AGAINST CMG FINANCIAL,

215.    Plaintiff Dr. Yasushi Tamura and Reiko Tamura had a mortgage with CMG.


### PLAINTIFFS CLAIMS AGAINST EMC,

216.    Plaintiff Evie Lengkong had  a mortgage witb  Chase, that was serviced by  EMC and SPS/ Select Portfolio Servicing, Inc

### PLAINTIFFS CLAIMS AGAINST OCWEN LOAN SERVICING LLC.

217.    Plaintiffs. Martin Medina and Joelle Medina had a mortgage with Wells Fargo that was serviced by / Ocwen

### PLAINTIFFS CLAIMS AGAINST Nationstar Mortgage LLC,

218.    Plaintiff Josie Alejo had a mortgage with Bank of America which has been service by Nationstar

### STATUTE OF LIMITATIONS

219.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' marked-up fee scheme.

220.    Defendants are under a continuous duty to disclose to Plaintiffs and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts. Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their' assessment of marked-up fees against borrowers' accounts. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active

concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

221.   The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts. Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against their accounts.

222.   Legal scholars have explained that, as a result of these deceptive practices, it is impossible for borrowers to determine that they are victims of these violations, because "without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated…the servicer could be overreaching and charging fees that are not permitted by law or by the terms of the contract…. By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system can only function as intended if complete and appropriate disclosures are made."[8]

223.   Additionally, judges examining Wells Fargo's conduct have found that, "[a]t the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors, the trustee, oi the Court, the nature or amount of fees and charges assessed…[l]Lack of disclosure facilitates the injury. Naive borrowers/debtors, trustees and creditors rightly assume that Wells Fargo is complying with the plain meaning of its notes, mortgages, court orders and confirmed plans. Why would anyone assume otherwise?... How are they to challenge a practice or demand correction of an error they do not know exists."[9]

## CLASS ACTION ALLEGATIONS

224.   Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a

---

[8] See Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87Tex. L. Rev. 121, 155 (2008)
[9] See In re: Jones, 418 B.R. 687, 699 (E.D. La. 2009).

class action under Rule 23 of the Federal Rules of 'Civil Procedure.

225.   The classes Plaintiffs seek to represent (collectively, the "Class") are defined as follows'.

All residents of' the United States of America who had a loan serviced by Bank of America and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Bank of America Subclass").

All residents of the United States of America who had a loan serviced by Chase and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Chase Subclass").

All residents of' the United States of America who had a loan serviced by Wells Fargo and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Wells Fargo Subclass").

All residents of' the United States of America who had a loan serviced by Citimortgage and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Citimortgage Subclass").

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7

All residents of the United States of America who had a loan
serviced by U.S. Bank, N.A. and whose accounts were assessed fees
for default-related services, including Broker's Price Opinions,
and inspection fees, at any time, continuing through the date of
final disposition of this action (the "US Bank Subclass").

8
9
10
11
12
13
14

All residents of the United States of America who had a loan
serviced by Union Bank of Switzerland and whose accounts were assessed fees for
default-related services, including Broker's Price Opinions, and inspection fees, at
any time, continuing through the date of final disposition of this action (the "U.S.
Bank of Switzerland Subclass").

15
16
17
18
19
20
21

All residents of the United States of America who had a loan
serviced by Indymac Bank and whose accounts were assessed fees
for default-related services, including Broker's Price Opinions,
and inspection fees, at any time, continuing through the date of
final disposition of this action (the "Indymac Bank Subclass").

22
23
24
25
26
27

All residents of the United States of America who had a loan
serviced by CMG Financial and whose accounts were assessed fees
for default-related services, including Broker's Price Opinions,
and inspection fees, at any time, continuing through the date of
final disposition of this action (the "Wells Fargo Subclass").

28
29
30
31

All residents of the United States of America who had a loan
serviced by Wells Fargo and whose accounts were assessed fees
for default-related services, including Broker's Price Opinions,
and inspection fees, at any time, continuing through the date of

CLASS ACTION COMPLAINT

final disposition of this action (the "CMG Financial Subclass").

All residents of the United States of America who had a loan serviced by FirstKey Mortgage LLC and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "FirstKey Mortgage Subclass").

All residents of the United States of America who had a loan serviced by EMC MORTGAGE LLC and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "EMC Mortgage, LLC  Subclass").

All residents of the United States of America who had a loan serviced by Ocwen Loan Servicing LLC and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Ocwen Loan Servicing LLC Subclass").

All residents of the United States of America who had a loan serviced by Nationstar Mortgage, LLC  and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Nationstar Mortgage, LLC  Subclass").

226.   Plaintiffs reserve the right to amend the Class definitions if discovery and further

investigation reveals that the Class should be expanded or otherwise modified.

227.    Plaintiffs reserve the right to establish sub-classes as appropriate.

228.    This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a) (1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

229.    Community of Interest: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

230.    Numerosity: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

231.    Ascertainability: Names and addresses of members of the class are available from Defendants' records. Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

232.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

CLASS ACTION COMPLAINT

233.    <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

234.    <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

      (a) The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

      (b) If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

      (c) Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

235.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2) and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

236.    The common questions of fact include, but are not limited to, the following:

      (a) Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code

sections 17200 *et seq.;*

(b) Whether Defendants' practice of charging marked-up fees to borrowers, as alleged herein, is illegal;

(c) Whether Defendants were members of, or participants in the conspiracy alleged herein;

(d) Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

(e) Whether documents and statements provided to Plaintiffs and members of the Class omitted material facts;

(f) Whether Plaintiffs and members of the class sustained damages, and if so, the appropriate measure of damages; and

(g) Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

98. In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any

such relief be extended to members of the Class on a mandatory, class-wide basis.

237.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

### Violation of Unfair Business Practices Act

### (California Business & Professions Code sections 17200 *et seq.*)

### As Against All Defendants

238.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

239.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act. or practice," For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq.*

240.   In the course and conduct of their loan servicing and collection, Chase and Wells Fargo omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed. Defendants conceal the fact the category identified as "Miscellaneous Fees" or "Other Charges" reflects marked-up and/or unnecessary fees that were never incurred by Defendants. Relying on Defendants, Plaintiffs and members of the Class believe they are obligated to pay the amounts specified in Chase and Wells Fargo's communications for default-related services.

241.   In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Chase and Wells Fargo's communications for default-related services, such as BPOs. Chase and Wells Fargo omit the fact that the amounts they represent as being owed have been marked-up beyond the actual cost of the services, or they are unnecessary, in violation of the mortgage contract. Contrary to Chase and Wells Fargo's communications,

Defendants are not legally authorized to assess and collect these fees.

242.    Defendants' omissions of material facts, as set forth herein, constitute an unlawful practice because they violate Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, among others, and the common law.

243.    Defendants' omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code sections 17200 *et seq.*, in that Defendants' conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiffs also assert a violation of public policy by withholding material facts from consumers. Defendants' violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

244.    There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

245.    California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice." Defendants' concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200. Defendants' concealment was made with knowledge of its effect, and was done to induce Plaintiffs and members of the Class to pay the marked-up and/or unnecessary fees for default-related services.

246.    Plaintiffs relied their reasonable expectation that Defendants comply with the plain meaning of the mortgage agreement, Notes, Security Instruments, court orders and confirmed plans, and as a result, Plaintiffs relied on Defendants' disclosures about the fees on their statements, reasonably believing the "Other Charges," "Other Fees," or "Miscellaneous Fees," to be valid charges that were not unlawfully marked-up and/or unnecessary. Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme

CLASS ACTION COMPLAINT

by telling borrowers, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage." Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the mark-ups, or unnecessary nature of the fees, and Plaintiffs would have disputed the charges and not paid them.

247.    Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices. Plaintiffs and members of the Class would not have paid Defendant's unlawful fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

248.    Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

249.    Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct its actions.

**SECOND CAIJSE OF ACTION**

**Violations of the Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. section 1962(c))**

**As Against All Defendants**

250.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein,,

**The Bank of America Enterprise**

251.    Defendant Bank of America, N.A. and its parent company are each persons within the meaning of Title 18 United States Code section 1961(3). At all relevant times, in violation of Title 18 United States Code section 1962(c), Bank of America, N.A. and its conducted

the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4). The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

252.    Bank of America's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

253.    While defendant Bank of America, N.A. and its servicer participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise..

**The Chase Enterprise**

254.    Defendant J.P. Morgan Chase Bank, N.A. and is servicer are each persons within the meaning of Title 18 United States Code section 1961(3). At all relevant times, in violation of Title 18 United States Code section 1962(c), J.P. Morgan Chase Bank, N.A. conducted the affairs of an association-in-fact enterprise with its affiliates, as that term is defined in Title 18 United States Code section 1961(4). The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

255.    Chase's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' account.

256.    While defendant J.P. Morgan Chase Bank, N.A., and its affiliates companies including Chase Home Finance LLC participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

**The Wells Fargo Enterprise**

257.    Defendant Wells Fargo Bank, N.A. and its parent company  are each persons within the meaning of Title 18 United States Code section 1961(3). At all relevant times, in violation of Title 18 United States Code section 1962(c), Wells Fargo Bank, N.A. and its parent

company conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4). The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

258.  Wells Fargo's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

259.  While defendant Wells Fargo Bank, N.A. and its parent company participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

### The Predicate Acts

260.  Defendants' systematic scheme to fraudulently conceal assessments of unlawfully marked-up fees on the accounts of borrowers who have mortgage loans administered by Wells Fargo and Chase, as described above, which was facilitated by the use of the United States Mail and wire, constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1) as acts of mail fraud and wire fraud under Title 18 United States Code sections 1341 and 1343.

261.  In violation of Title 18 United States Code sections 1341 and 1343, Wells Fargo and Chase utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Wells Fargo and Chase by obtaining money from borrowers using false or fraudulent pretenses.

262.  Through the mail and wire, Wells Fargo arid Chase enterprises provided mortgage invoices, loan statements, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up and/or unnecessary fees for default-related services, such as BPOs.

263.  Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore,

they are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property, Defendants' assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property.

264.    The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts. Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

265.    Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terns of your mortgage."

266.    Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

267.    Additionally, using the internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

268.    In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from Plaintiffs and members of the Class, Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by the fact that they did not disclose the mark-ups and/or unnecessary nature of the fees in their

communications to borrowers.

269.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

270.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Wells Fargo and Chase racketeering enterprises.

271.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

272.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

273.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages. Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## THIRD CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c)

### (l8 U.S.C. section 1962(d))

274.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

275.   As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants Wells Fargo & Company and Wells Fargo Bank, N.A., conspired to violate the provisions of Title l 8 United States Code section 1962(c).

276.   As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home

Finance LLC conspired to violate the provisions of Title 18 United States Code section 1962(c).

277.    As a direct and proximate result, Plaintiffs and the members of the Class have been injured in their business or property by the predicate acts which make up Defendants' patterns of racketeering activity in that unlawfully marked-up and/or unnecessary fees for default-related services were assessed on their mortgage accounts.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### As against all defendants

278.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

279.    By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

280.    The mortgage contract between Defendants and borrowers like Plaintiffs and the members of the Class allows Chase and Wells Fargo to pay for default-related services when necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize Defendants to mark-up the actual cost of those services to make a profit, nor does it allow Defendants to incur unnecessary fees.

281.    Nevertheless, Defendants mark-up the prices charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit.

282.    Thus, Plaintiffs and members of the Class were unjustly deprived.

283.    Defendants are aware that it is improper to mark-up and/or assess unnecessary fees on borrowers' accounts for default-related services. Therefore, Defendants

fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as 'Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances."

284.  Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

285.  It would be inequitable arid unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

286.  Plaintiffs and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

Plaintiffs, and on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1. Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2. Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged misrepresentations discussed herein;

3. Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

4. Awarding restitution and disgorgement of Defendants' revenues to Plaintiffs and members of the Class;

5. Awarding Plaintiffs and the members of the Class treble damages in an amount

according to proof at trial;

6. Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

7. Ordering Defendants to engage in corrective advertising;

8. Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9. Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

10. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby respectfully demand a trial by jury.  U.S. Const. amend. 7 and Fed. R. Civ. P. 38

Dated:  February 9, 2017                    Respectfully submitted,


                                            PACIFIC RIM LAW GROUP


                                                    /s/

                                            _____

                                            Mia Yu  SB#290740
                                            301 E Foothill Blvd., Suite 202
                                            Arcadia CA 91006
                                            Tel 312-622-7670
                                            Fax: 626-226-5913
                                            Email: Lawyerym@hotmail.com